Good morning, Your Honors. My name is David Crowe, and I'm here on behalf of Appellant Colin Bancroft. I would like to reserve four minutes for rebuttal. Okay, please watch the clock. I would like to start by addressing ten fundamental principles of Washington insurance law which apply to this dispute. Number one, insurers that sell products to consumers in this state are required to follow and to know the regulations prescribed by our legislature. Number two, in this state, insurers have a quasi-fiduciary duty to their insureds. That is to say, in all things left to the discretion of the insurer, it must treat the insured's interest equal to its own in all things. Number three, under Washington law, where parties agree to a construction of a contract, the court is to deem that construction controlling. The court is not to change what the parties agreed the contract was meant to be read as. Number four, if there is any ambiguity in the policy, the policy is to be interpreted in a light most favorable to the insured. Number five. I think we're all familiar with the legal principles at issue. So if I could interrupt you with a question, it seems like one of the central issues in this case and what opposing counsel primarily stresses is that all of the medical experts agreed that Minnesota Life acted reasonably in its reliance on the, I guess the MIPI standard to determine that Mr. Bancroft's life expectancy exceeded 24 months. And so if Minnesota Life therefore acted reasonably, according to opposing counsel, there is no genuine issue of material fact on any of the claims and so the district court was correct. Given this argument that everyone agrees that Minnesota Life acted reasonably, do you disagree with that or what's your response to that? That is not accurate, Your Honor. Everybody agrees that reasonable physicians can have differing reasonable life expectancy prognosis. That's what that's about. What is for the court to decide is whether the insurer's actions at the time it denied the claim, they acted in a reasonable basis. That's the reasonability you need to be addressing, not whether different doctors might have different medical expectations of how long somebody might live. That clearly could be a huge realm of possibility and the way the policy is structured, it's not left to just to have the insurer's doctor's opinion control and that's what the insurer did here. But counsel, your doctor was Dr. Cowan, right? My client's doctor was Dr. Cowan. Dr. Cowan and his original statement to the insurer was basically a median life expectancy of 24 months, right? The physician certificate he provided to the insurer was a median life expectancy of 24 months. Actually, no, that's not true. He said he expected Colin Bancroft's life expectancy to be 24 months. And then he cited to one article and he also cited to a lot of other information, but the article he cited to actually showed the median life expectancy for somebody with Mr. Colin Bancroft's life expectancy would have been 23 months at the date of diagnosis, which would have been a lot less. Now, granted, there's more information that's coming out. It's over-evolving. It's a rare blood disease that only a short, small number of physicians know about or actually practice with. But how does a median life expectancy of approximately 24 months equal evidence of a life expectancy of 24 months or less? I mean, doesn't the fact that it's median mean half the people live longer, half the people live shorter? Isn't that what median means? You're absolutely right. You're absolutely right. The whole idea that they're relating just to medians is kind of irrelevant here because the expectation in this policy is what's the life expectancy of the actual insured and how do we examine that? We examine that by having the treating physician give his best analysis of the facts of the case and of the insured. We also examine that and analyze that on the insurer's perspective. If they don't believe it, they can have another doctor who's disinterested provide a similar evaluation and that's what the policy calls for. So the district court took the position that the policy did not require Minnesota Life to seek an independent medical exam and the plain language of the contract does seem to support that. Do you disagree with that? I absolutely disagree and this is one of the fundamental principles of Washington law. Both the insurer and the insured, we refer back to the policy which is ER 501, the fifth paragraph down under this heading terminal condition, provides two sentences. These two sentences, both the insured and the insurer throughout this litigation agreed were linked together. The insurer took the position that if it didn't provide an independent medical verification, it need not provide Colin Bancroft alternative dispute resolution in which a disinterested third party could decide whether the claim should be covered. But the language that the district court focused on was we retain the right to have an independent medical exam and so it said therefore it didn't have an obligation to provide that. Absolutely. So you don't disagree with that? You're just saying that there's an inference. I'm saying there's an inference. No, I'm saying they're linked and I'm saying you're absolutely right. They didn't have to do an independent medical verification. They had every right to accept and pay the claim. They retain the right to object to the physician certification and if they do, they can have an independent medical doctor examine them. So they're not allowed to say the evidence that you have submitted does not establish that the life expectancy is 24 months or less. Their only alternative is if they're not satisfied, then they have to do an IME no matter what? Under the way the parties agreed this provision should be written, these two sentences, yes. I do agree with that. Although I think what would be more likely and more reasonable given these are terminally ill individuals. They don't have a whole lot of time left. That's a purpose why numerous states have adopted these accelerated life insurance benefit regulations, which Minnesota Life willfully ignores. Doesn't even know existed. Let me ask you a question. So you're arguing these two sentences have to be read together because the parties said that below? The parties agreed that that was the proper construction of the policy and under Washington law. You don't think that this is an ambiguous policy, correct? Well, two things. The parties argued it wasn't ambiguous because we both agreed those two sentences were linked. We both found them to be linked, so therefore it wasn't ambiguous. When you say that the two sentences are linked, are you relying on a rule of construction for contracts or for insurance policies in particular in order to argue that we have to read those two together and therefore by not doing so, the district court erred? Yes. Let me explain why. You first, in Washington law, you read it as an average insurance, an insured would read it. Now, if you look at under terminal condition, nearly half the language is addressing what an independent medical verification is. It's telling you you're giving up your rights to be picked and probed by whatever doctor Minnesota Life wants to challenge your opinion with. Half of the policy area is talking about this. So yes, I think that a reasonable person would say that Minnesota Life cannot deny my claim because I'm not one of the outliers in the top 10% who might die that, well, you know, I need to be an outlier on a bell curve. They think that if my doctor's physician, my physician statement is untrue and it can't be a relative, they define what his physician certificate needs to be. If it's untrue, they will provide an apples to apples comparison. They will analyze what's wrong with the actual person. Now, that's a benefit to the insured. That's a benefit to make sure that they are heard and their body is examined to have a fair comparison. So there's no actual language in the contract that states that. Is that correct? No, that's not. That's not correct. Because if you look at the... What language are you saying says that they cannot deny the claim without a IME? It doesn't say that in the contract. You have to read the contract. That's not in the language of the contract. You have to read the contract in conjunction with what is, what the reason for this being in the contract is, is that it has to follow Washington's regulations on accelerated life insurance benefits. Well, the district court also put some weight on the fact that your client didn't attempt to trigger the provision allowing for arbitration or mediation, but immediately brought a lawsuit. Two things. First, that is ludicrous under the facts of the case, and let me explain why. The insured interpreted the contract the same way as the insurer did. They both thought alternative dispute resolution was only allowed when a independent medical verification was conducted. They read the provision the same. Secondly, and please focus on this denial letter. It is amazing in what it doesn't state. It does not state they applied a heightened 90% certainty standard, and it says nothing about a doctor reviewing the claim. There was no indication until after I filed an initial summary judgment brief that showed what Minnesota Life really did when it denied this claim. I'll say you're welcome to provide additional information, and we'll be willing to consider it and the like. So do you think it was reasonable to immediately bring a lawsuit based on the language of the contract? Is that your position? Two things. Well, three things, I guess, with following your question. Number one, the letter doesn't say additional information. It says new information. They have already looked at this diagnosis, and they've already found we're not going to pay it. Indeed, the letter, if you look at it, says we're not going to consider your claim. Now, if we're going to resolve something amicably between us, and your first sentence is, here's my position, I can provide it to you, and you say, I'm not going to consider that, clearly you're not working to amicably resolve the claim as is required under Washington law. Next, Mr. Bancroft did not immediately bring a lawsuit. There is a cooling period in the Washington Insurance Fair Conduct Act, which allows an insurer and say, you made a mistake here. Let's work it out. And in my practice, representing insurers, this works. It does. People contact you after you send the notice out. They say, is there a problem? Is there something we did incorrectly? What can we do? Minnesota Life, when requested to do so under the statutory scheme in Washington, didn't  I'd like to save the rest of my time for rebuttal. All right. We'll hear from the other side. Good morning. Medora Morris on behalf of Minnesota Life Insurance Company. I think the place to start is on the breach of contract issue and your Honor's first question having to do with the undisputed evidence from the medical experts and your Honor's Judge Bennett's pointing out of the median life expectancy. And I think these are important points to focus on because when you look at the actual evidence, what Dr. Cowan, Mr. Bancroft's doctor, testified to was that Minnesota's life's reliance on this MIPI, the Mental Cell Prognostic Index, which showed life expectancy greater than reasonable, not only in a generic proposition as to reasonable minds can differ, but also specifically as to Mr. Bancroft, that's specifically in the deposition. And so that's undisputed that Dr. Bancroft's, Mr. Bancroft's own doctor agreed that Minnesota Life's reliance on that longer duration was reasonable as to Mr. Bancroft. So if I understand the argument, it's that Minnesota Life really could not turn down or deny the claim based on its own internal thought process. If it wanted to do that, it had to have an independent medical exam. And the reason for this is absent an independent medical exam, the provision for arbitration would not be allowed. And that's something that's a requirement under Washington law. What's your response to that? Yeah, Your Honor, that's, that's incorrect. There's this whole notion about linking these two sentences, the independent medical exam with the right to arbitration. That was your client's position, correct? Well, I will point out that during argument prior to the order on summary judgment, we conceded that they are not linked. And so that issue actually isn't before, Your Honor. That issue was conceded during hearing. But I think the argument is that that's, that's the fair reading of the contract and one that Minnesota Life at least at one point agreed. And that's what Mr. Bancroft would expect, what a reasonable insured would expect in reading the contract. A couple of things. First of all, it was an unexpressed intent. Mr. Bancroft was never told what Minnesota Life's interpretation of that contract was. There's nothing in the record that Mr. Bancroft ever even read the contract. But the, I think the more important thing is that, that construction about linking these two is unreasonable. And so therefore, it does not create an ambiguity. And the reason why it's unreasonable is because, first of all, as Your Honor's pointed out, the contract very clearly reserves to Minnesota Life the option to have an IME. Otherwise, we'd have to read out the word, you know, we reserve the right. Conversely, we have to read the policy in conjunction with what Washington law requires. And so in order to have a right to arbitration, and it's the insured's right, not the insurance company's right, then we cannot have a trigger that is at the discretion of the insurance company. And so the only way to read this is to have them not linked. In other words, and also the third part is there's absolutely nothing in the statute that requires an independent medical examination. It just talks about the difference of opinions. So in that second sentence, it does say, in the case of a difference of opinion, how do you, how does your client interpret that phrase, difference of opinion? What does that mean? Okay. So I think we have to look at this in context of Washington law and the policy. And how do we convey to an insured that we have a difference of opinion? I mean, it can't be a phone call because we have a Washington administrative code provision that says you have to accept or you have to pay or deny a claim within 15 working days. And so we had that obligation to do a written notice. The second thing is that difference of opinion can be an internal doctor. I mean, even the regulation recognizes that there may well be differences of opinion. And the third piece is that the letter that came out, which we're calling a provisional denial, I think it's semantics, but what that letter says is there's a difference of opinion. They talk about what Dr. Cowan's position is and they talk about what their position is. And then they say, we will gladly reassess. And the important thing to remember here is Minnesota Life was always going to pay this claim. This is literally a matter of timing. Mr. Bancroft was on a premium waiver. He wasn't even paying premiums. He was always going to have his claim paid. And so what they were looking for is we're using the gold standard, the MIPI standard, which Dr. Cowan admits is reasonable. What else is there? Is there some reason why we should be looking at something else? And they invited, in that letter, him to respond. And I believe Mr. Bancroft's response is, A, I don't need to engage in any kind of amicable resolution. And the idea that an insurance fair conduct notice, which is notice that you are going to sue your insurance company, it says it right there, is somehow a way to amicably resolve lawsuits is simply not reasonable. The other issue is the idea that he was going to have to not make any demand for ADR. I mean, this lawsuit was filed right away. And if, in fact, ADR was important, I mean, people don't get their arbitration rights a lot of times that have a right to contract or whatever. The proper thing is to bring a motion to compel arbitration. That could have been the very first thing. That didn't happen. And so we have a situation where Mr. Bancroft was advised that he would have his claim gladly reassessed, and that was the, I believe that's the provisional denial letter, the way they convey the disagreement. And then in response, we got sued. So in terms of looking at the triggers, I think it's pretty clear that, yes, the opinion of the doctor is not binding. It's not binding because it's provisional denial. They're always going to reassess it. They were always going to pay it. Number two, the parties should attempt to amicably resolve, and that's what that provisional denial letter was. And then if they can't resolve it, then they get to go to ADR or mediation. Counsel, the insured is arguing that he ought to get his attorney's fees because only as a result of the lawsuit did you pay the claim, that there was discovery four or five months after the claim, the lawsuit was filed, based on the discovery, you decided that the insured's life expectancy was then less than 24 months, and you paid the claim, I think, in November of 2017. So why isn't that argument correct? That argument is not correct because this is not a situation where Minnesota Life, after getting sued, said, whoops, we made a mistake. We're going to now pay. And in those situations, I believe there's one case where there's the public policy says that in that case, it really was the lawsuit. Here what we have, a very different situation. Minnesota Life tried to get information, and at this point, Mr. Bancroft was represented by counsel, and look at ER 697. There's informal requests for information prior, way prior to any motion for summary judgment being sought. Those were revoked. There was formal discovery. Then there was motions to quash by Mr. Bancroft. Their position was you get nothing. You get no information. And so it wasn't until Dr. Cowan's declaration in October, we finally had something to look at. In that declaration said two important things. Number one, for the very first time, unlike his attending physician statement, he recognizes the importance of the MIPI score and acknowledges MIPI is the correct standard. But he says there's two types of MIPI scores. There's one that's called the biologic, which has 37 months, and that's the one that Minnesota Life used in its June denial. And then there's the non-biologic, which is the 29 months, and he says in his declaration, mind you, we have no records at this point. We're simply trying to get some information. The only thing we have is his declaration, and he says people with the 29-month life expectancy, median life expectancy, have similar factors to Mr. Bancroft. And oh, by the way, it appears that Mr. Bancroft, from the declarations, both Mr. Bancroft's and Dr. Cowan's, that Mr. Bancroft was, in fact, not having the improvement and the good condition statement. Now, later on, when we finally get records after having to fight that in court, that actually wasn't true. He had a very, very good recovery and was in full remission. So there's two new pieces of evidence that get delivered to us via the lawsuit, but not because of the lawsuit. And so... So you learned about the supposed remission after you saw the declaration that said he had reacted negatively to treatment? Yes. And so when that claim gets paid on November 1st, paid in full, we did not have medical records. And it wasn't until, because the lawsuit unfortunately continued for an hour or two years out from that payment, we got medical records. And the medical records showed that, in fact, Mr. Bancroft had had a complete and full remission, that, in fact, Dr. Cowan had told Mr. Bancroft that his life expectancy, the overall median life expectancy was five to seven years. So there was a lot of information in those medical records that, you know, who knows if we had gotten them earlier, what would have happened. But the important thing for the trajectory of the litigation is that when we finally got information from Dr. Cowan, which we were looking for new information, we had said, please send us any new information. And he now says, oh, I'm going to adhere to MIPI. It's going to be the 29 months. And that's what applies to Mr. Bancroft. And that's when it got paid. And then later on, we get the medical records. I haven't heard too much about this whole 90 percent certainty issue, but I think it's just a red herring. It doesn't really matter in this case because Dr. Chaplin testified that whether she applied the more likely than not or the 90 percent certainty standard, her result would have been the same. Dr. Cowan agrees. And I think it's important when we're talking about life expectancy, you know, getting back to your point about median, you know, to be 90 percent sure that you're correct as opposed to 100. We're not requiring 100 percent. So there is still this area where, you know, reasonable doctors could disagree. And of course, Dr. Cowan did not disagree with Dr. Chaplin. The concept also of median survival is not something that Minnesota Life dreamed up. It's in, as Your Honor pointed out, in the attending physician statement. And Dr. Cowan also testified at ER 303 that oncologists use median survival to talk to patients about life expectancy and survival because picking someone's exact, you know, life expectancy is fairly impossible. And in terms of the, I think the four arguments that Planoff has posited, it's important to focus on the fact that there are no disputes of fact. Dr. Cowan admits that his basis for deviating from the MIPI that he puts in his declaration was later found in his deposition to be unsupported. And he admits it. He admits that the study he relied upon in the APS, he says, could be outdated. He admits that the genetic variation called P17 that he puts in his declaration as a basis for deviation, he says, oh, well, I admit that later studies have found that that's not an important factor. He admits that the new evidence, MIPI is the newer and more current evidence and is completely appropriate. And so all the ostensible reasons for deviating from the MIPI, Dr. Cowan himself agrees are not necessarily reasoned, even though he has a different conclusion. And so we don't have a dispute of fact. I mean, what would a jury decide? At the time you paid the claim, did you know that Mr. Cowan had had a bone marrow transplant? I have to look at the attending physician statement. I think it was scheduled is my understanding. So, the question is, could any reasonable jury find that Minnesota Life's decision to rely on the evidence that it did, that Dr. Cowan found was reasonable, was unreasonable? I mean, you'd have to have a jury finding that Dr. Cowan's testimony is irrelevant. And we just say that that can't be the case. And comments about discounting Dr. Cowan's opinion are really just Dr. Cowan's admitted facts and they're just laid out there. And getting back to the taking away the ADR rights, I think it's important to think about there's a couple of triggers. One is the amicable resolution. And if Mr. Bancroft didn't satisfy that condition or felt that he had satisfied for some reason, then he has to make a demand for arbitration. It reminds me of the ERISA statement of rights that we have in the ERISA claims regulations. Federal law requires that all ERISA plans, summary plan descriptions, explain that you have a right to file a case in state or federal court. But nothing requires that you tell claimants or participants in a denial letter, you have the right to file in federal court. It's the same thing here. It's in the plan. He had an attorney. He could have moved to compel if, in fact, that's what he wanted to do. So I don't think there was any taking away of Mr. Bancroft's ADR rights. Thank you, Rhonda. We have some time for rebuttal. Been doing this repeatedly. I trust the court will review the facts in the record. Because unlike Minnesota Life's claim now, that it always would have paid the claim, there is no fact in the record that indicates that. This was a group life insurance policy under an employment plan with King County. Mr. Bancroft could lose his life insurance if he didn't keep his employment with King County. Mr. Bancroft works at the sewage treatment plants where there's all kinds of biochemicals he needs to work with on a daily basis. So before we start accepting statements like, they always would have paid the claim, and to Minnesota Life, it's a matter of money. It's not a matter of just money or any indication they would ever always pay the claim to the insured. An insurer's conduct is judged at the time it denies a claim. Here, it's plain, what all it did was had its in-house doctor read one article, looking at one median, and then saying, and rightfully so, if you read one article with one median, and it states, and you come up with a conclusion, I'm not 90%, more than 90% sure he's going to die based on the information I have, that's what they did. They didn't examine all the articles about the MIPI. They didn't look at all the articles about all these different treatments he could have that have vastly different outcomes for each individual. But this is all information Dr. Cowan knows. He works with it on a daily basis, addressing terminally ill individuals. It is a farce to think that the medical information in the file that Minnesota Life conveniently does not provide for your review says anything differently. Mr. Bancroft, what they're basically alleging is Dr. Cowan and Mr. Bancroft are trying to commit insurance fraud. That's ludicrous, and not supported by the facts in the record whatsoever. Ninety to ten. Please review the policy carefully. Please review the denial letter carefully. You think to yourself, is there any reason I would think the insurance company is only going to pay me if they're more than 90% certain that the average person, the 90% certain that somebody would die? Are they only going to pay me if I'm an outlier on a bell curve? Is that what you're purchasing when you buy this policy? Opposing counsel indicated that the medical record showed that Dr. Cowan had advised Mr. Bancroft that five to seven years or more was likely. He did state that there are new studies out there because he was talking Mr. Bancroft into doing a clinical study. And there is new possibilities out there that we don't know. And you know what? Currently, there's a lot of bad, it's rare disease, and Dr. Cowan works with it daily. And you notice they don't put those documents in. They don't put the whole medical records in to say this. They're taking snippets of a declaration, of the deposition, where they address one or two sentences that's discussing some of the information Dr. Cowan provided the client, and now telling you that, oh, they were lying to you. He wasn't telling the truth, and he'd be smirching Dr. Cowan's testimony, which is not warranted. So Dr. Cowan did not tell Mr. Bancroft that five to seven years was likely. He said that was a possibility with the new treatments that are out there. It's a possibility. Okay. He's looking forward to the future. And you know what? If you go through these heinous treatments and poison yourself, you might have a chance to a longer life. That's what he was telling him. And Mr. Bancroft is getting poisoned, and he's fighting cancer. And now it's a question of whether it's going to be the poison that he's using to fight the cancer, or whether the cancer's going to kill him. But to say that Minnesota Life was always going to pay the claim, look at what they did and when they did it, and that's when Washington law requires you to judge them by their actions. Their actions were in bad faith. They didn't treat his interests equal to his own, and it was entirely unreasonable to treat a terminally ill insured this way. Thank you, and I expect if you follow the Washington Fundamental Principles of Washington law, you should find judgment in favor of Mr. Bancroft. Thank you. Thank you. We thank both sides for their argument. The case of Bancroft versus Minnesota Life Insurance Company is submitted.
judges: Ikuta, Benntet, Dorsey